We'll hear argument next in Case 10-1211, Vartelas v. Holder. Mr. Bibas. Mr. Chief Justice, and may it please the Court, as the government concedes, INA subsection 101A13C5, added by IRIRA, does not expressly mandate retroactivity. Under Landgraf, applying that new provision would attach new legal consequences to pre-IRIRA offenses, penalizing both those who travel and those who don't. Covered lawful permanent residents could not visit their parents abroad without being forced to abandon their children here. They would be removed from the country or else confined here. Either way, they would lose an ability they had under pre-IRIRA law based on pre-IRIRA offenses. Thus, applying the subsection to them would be impermissibly retroactive. The settled expectations at issue here are those of round trips by lawful permanent residents, not, as the government would put it, one-way tickets or first-time entrants. These are people who have structured their lives here. They have homes, spouses, children, and careers here, and yet have a settled expectation that they will be able to maintain ties to visit aged and ailing parents abroad, to go to funerals and wakes and visit them in the hospital and surgeries. Our amici, the NACDL brief, and the aged and ailing parents. Ginsburg. As far as going forward is concerned, that's just the way it is, right? Yes, because Congress has expressly changed the law post-IRIRA. The question is, for those before IRIRA, whether those settled expectations are being disrupted. Could they, the person who is here and then the new law is passed, could that person have petition for discretionary relief before traveling? Yes, Your Honor. That is a possibility. That is not the same as the automatic ability to travel, and, in fact, in this case the discretionary relief was denied. It depends on a different set of factors from the automatic pre-IRIRA ability to travel. But it is a theoretical possibility in some cases. So your expectations argument is that somebody trying to figure out whether to go ahead and rob the bank is going to say, well, if I do and I'm caught and I'm found guilty, I won't be able to take temporary trips abroad, so I'm not going to rob the bank. No, Your Honor. First of all, you phrased it specifically as a reliance argument, which is an alternative. Even the government concedes it's not a prerequisite. Second, the right time to look at expectations is the moment before the law is enacted. Does one have an expectation at that point that one will be able to continue? Roberts, you are concerned under Landgraf, I think, with whether or not it disrupts settled expectations. And it just doesn't seem to me that this issue enters into the expectations at all when the pertinent act, which is the commission of the crime, not the pleading guilty, takes place. No, Your Honor. I believe the practical impact is a new travel disability or penalty. Just as in Landgraf, the discrimination there had been illegal for decades, yet adding a new form of damages to it was impermissibly retroactive. In Hughes Aircraft, filing false claims with the government had been illegal for years, yet broadening the class of people who could file suit and removing a defense, no reliance possible at all, but there was a settled expectation that there would be no additional consequences attached to it. Alito What's the difference between someone who commits the crime just before the act is passed and someone who commits the crime just after the act is passed? A person who commits the crime just after the act is passed had the expectation prior to the passage of the act that if he did certain things, he wouldn't have this consequence from his conduct. Congress, of course, has the power to change things. But the expectation until an act is passed is that the consequences are fixed in time. And if Congress decides that the potential unfairness is outweighed by the benefits of making the act correct. Alito But the person who commits the crime just after the act is passed had the expectation prior to that time that had — if he did certain things in the future, he wouldn't suffer certain consequences. And yet Congress has affirmatively warned and put everybody on notice that now there is this new consequence. You may be deterred by this new consequence. We may be punishing you by this new consequence, but the consequence has been announced. Scalia Mr. Bibas, I have — this is almost a question of personal privilege. You make your whole argument on the basis of Landgraf. So does the government. You do not cite, the government cites but does not discuss the relevant portion of a later case which involved the same question, Republic of Austria v. Altman. I concurred separately on Landgraf because I thought that the test that the Court was using, upsetting settled expectations, was indeed the proper test for constitutional provisions forbidding ex post facto laws, which is where the Court derived it from, Justice Story's opinion in a New Hampshire constitutional case. But I said in my concurrence that the proper test for the other issue of retroactivity, namely constitutionality aside, does this statute mean to be applied only in the future or in the past? And for that, I propose — well, I'll read you what we said in Altman. Our approach, which postdates Landgraf, our approach to retroactivity in this case thus parallels that advanced by Justice Scalia in the concurrence in Landgraf. Quote, and it's quoting the concurrence, the critical issue is not whether the rule affects vested rights or governs substance or procedure, but rather what is the relevant activity that the rule regulates. Absent clear statement otherwise, only such relevant activity which occurs after the effective date of the statute is covered. Most statutes are meant to regulate primary conduct and hence will not be applied in trials involving conduct that occurred before their effective date. But other statutes have a different purpose and therefore a different relative retroactivity event — relevant retroactivity event. And that is what we have here. The event that is sought to be regulated is entry into the United States. And it is clear that this statute applies only to prospective entry into the United States. It doesn't apply to past entry so that those people who came in in violation of this statute can be deported. Now, why shouldn't we apply that rule in this case as we did in the Republic of Austria case? No, Your Honor. First of all, our reply brief discussed Altman, and the majority of the Court has viewed that as limited to the foreign sovereign immunities context. But taking your test on its own terms. Scalia, why would it be limited just to the foreign sovereign immunities context? That's the majority's approach. But taking your test on its own terms, what you're pointing out is there is a future Why do you say that's the majority's approach? I'm sorry. The majority in Fernandez-Vargas expressly said that Republic of Austria was in a sui generis context and that its holding shouldn't be extended to Fernandez-Vargas. Its holding. Yes. But to take — to look at your test, you are pointing out that there is a future event, which the government, practically its entire theory turns on that. But even if there is a future event, there is a past event being regulated here, and the activity at issue under your test would be the pre-IRIRA offense, not just the innocent post-IRIRA travel. What we have is future lawful travel, concededly lawful, nothing nefarious needs to be shown of this. Well, Mr. Bibas, how is it different, then, from a felon in possession statute where you look at the past offense and then you say, woe this man, but the cause of that past offense, can't buy a gun in the future? How is it different at all? Your Honor, there are five pertinent distinctions, permit me to unpack. The first and most important is that the Landgraf test should have a broader scope than the ex post facto context in these criminal cases, because Congress can override it expressly. Since the ex post facto clauses disable both State and Federal legislatures from acting at all, the deprivation of power must be narrow and careful so State and Federal legislatures can continue to regulate felon in possession or racketeering or the other crimes the government advances. But Landgraf just tells Congress how to legislate. It's a background rule. So it's legitimate to have a presumption against retroactivity sweep more broadly, as Congress is free to override it and, as I will explain, does override it regularly. Secondly, felon in possession is inherently dangerous conduct. This is a protective law. It's not just a punitive or deterrent law. The third and related point is that felon in possession laws are tailored. There is a nexus to a danger, a threat to people suffering firearm violence, narrowly tailored. Fourth Kagan But why isn't the government, Congress, making the exact same judgment here? If the activity to be regulated is entry and Congress is making a judgment that we do not want dangerous people to enter and we're using the conviction, the prior conviction, as a marker for who is dangerous. And that's exactly what Congress has done in the felon in possession statute. Waxman Your Honor, I believe the two are quite different. Felon in possession is limited to firearms in the hands of proven dangerous people. Here we have a law that says you can stay in the country indefinitely. We're going to discourage you from going abroad and leaving the country because we'll make it harder for you to come back. That's not tailored at all to protecting the people inside the United States. I'd also point out that the felon in possession statute, as this Court noted in Heller, is part of a long tradition of forbidding such activity as a crime. So it's hard to say there are settled expectations being upset by felon in possession laws. And the final one is Congress can do that simply by being explicit. And it has done so repeatedly in laws such as IRIRA. Elsewhere in IRIRA, section 321b says the aggravated felony definition applies to convictions entered before, on, or after the statute's effective date. It knew how to do it. It did it more than a dozen other times in IRIRA, as this Court noted in Sincere. It didn't spell it out here. The point of this Sotomayor What about the career criminal enhancements instead of the felon in possession? And assuming your arguments, what limits can Congress put on anyone with respect to future conduct if it's going to be a burden? Under your view, it stops people from traveling. Career criminal statutes put on the distinct disadvantage of a longer sentence. Yes, Your Honor. And as we noted, in the criminal context, this Court in Witt and Greiger notes, it's a heavier punishment on the new crime because it's aggravated, because it's repeated. And because Congress has more leeway in the ex post facto context and because recidivism enhancements have a long tradition, it's entirely legitimate. There's no need to say that that's punishing the past offense because the future offense, it's permissible to increase it under the ex post facto clause. And that's an inquiry that's different from the Landgraf test here, because all Congress has to do is spell out expressly, we want to apply this to convictions entered before, on, or after the statute's effective date, which it did in 321b, which it didn't do here.  Sotomayor, I don't want to go any more to whether or not the BIA's conclusion that Congress intended to rescind the Flaherty decision, but you assume that's what its intent was. We've assumed arguendo because that's the premise of the question presented. So if we assume that, if we assume that was Congress's intent, doesn't that start to give you the conclusion? If Congress intended to undo it, doesn't that prove that they intended to affect it retroactively? No, Your Honor, it doesn't. All the case law, the legislative history, the other discussion was about certain other aspects of entry doctrine that needed to be changed. The discussion was express about saying we're changing the definition from entry to admission because we don't want people who snuck into the country outside of a country that's not a country. Sotomayor, those go to the basic premise. If you assume Congress intended to rescind the prior doctrine, isn't that proof itself that it intended to apply the statute retroactively? No, Your Honor. To this conduct. No, Your Honor. Congress can intend to rescind it to abrogate a statute such that it will have no effect going forward. But as this Court noted in Landgraf, the background default rule that the public and Congress expects is that new laws will apply prospectively. That has the virtues not only of giving a clear background rule against which Congress legislates, against which it did legislate in IRIRA, but it also forces Congress to advert to the potential unfairness of retroactivity and decide that the benefits outweigh it. That's what this Court said in Landgraf. It makes perfect sense. And that clear statement rule serves the function of having them smoke out into the open. If you think it's beneficial to make this affect convictions in the past, just say so. But it didn't. So to go back to our primary point with the practical impact or effect being a new travel disability, the government's argument seems to boil down to that because there is one event that must happen after the statute's effective date, therefore there can be no retroactive effect.             Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. So the government says just picks an event at random and makes it the trigger mechanism. The government has picked the event that it wants to regulate, which is entry. Verrilli, Yes, Your Honor, but this is an effect test. And under Martin v. Hadex and Landgraf, we have to take a common-sense functional view of what the effects are, the new legal consequences. Roberts, I would have thought your answer to my colleague would be no. What they want to regulate is the staying in the country. And they're trying to make that as uncomfortable as possible in order to encourage the individual to leave. If he can't go to the parent's party, the cousin's wedding, or whatever, he's just going to leave. And then once he does, he can't come back. Why would the government care? It's a question for them, I'm sure. Why would they care whether somebody that they don't want to be here stays here? It seems to me the exact opposite. So I would have thought your answer would be no, what they're trying to regulate is not the coming and going, but simply the staying. Verrilli, Yes, Your Honor. You're right that, particularly given the strange way in which it's written, it's hard to understand it as something other than a penalty and possibly a deterrent, but certainly a penalty based on past crimes to make life uncomfortable. And that does not speak of a protective, forward-looking, exclusive function, if that's the test. But to go back to the earlier point, if that were, if we were to follow the approach Justice Scalia outlined, that would be the right response, but we don't even need to get there because the primary test under Landgraf is not the point or function or purpose, but an effects test. The effect, as the government concedes, is to force him to choose between his parents in Greece and his wife, children, career, and home here. There are a lot of statutes, which we interpret to be valid and not retroactive, which have a substantial effect. You can pass a statute altering the rules of evidence, which have the effect of making someone who committed a prior murder convictable, whereas before he was not convictable. And we don't just look to the effect and say, well, it has that substantial effect, so it's operating retroactively. We say, no, it's a rule of evidence, it applies in the future, and that evidence can come in. And that's my problem with this other approach. There are often adverse effects upon activities that occurred before the statute was enacted, but we still regard the statute as prospective only and therefore not subject to special rules for people who are affected. Well, setting aside the difference between the ex post facto context and the civil context, and there is the procedural distinction, which I know Your Honor didn't sign on to, it's also relevant that here it is directly, expressly tied to a past conduct. It's preconditioned. It's not even a piece of evidence or something one can draw an inference from. It is a precondition for ineligibility under 101A13C5. And therefore, it looks like the disability that Justice Story said. A disability has to involve future conduct, but if it's expressly disabling future conduct, that's a penalty on past conduct. The disability in St. Cyr of not being able to apply for future discretionary relief. The disability in some other cases of this Court that we found after briefing and alerted opposing counsel to, Cummings v. Missouri and Ex parte Garland in Volume 71 of the U.S. Reports. Even though the law there forbade teaching in the future or holding office or preaching or being a member of the bar, the government's theory would say those are post-enactment things, just refrain from teaching. You don't have a vested right to teach. This Court said no. We recognize those are expressly targeted to punish the past membership in the Confederacy that triggers that disability. And so the government's approach would render the Justice Story's disability category a nullity. It's a matter of the examples that you just gave that admission to the United States is purely a matter of legislative grace, while we might conclude that teaching, being a member of the bar, whatever, is not. I don't believe that that is important. That only matters to the vested rights argument. And this Court in Cummings said expressly it was dealing with a privilege. So, moreover, Well, I'm sorry, which privilege was that? The privilege of teaching or the privilege of holding office. So you can't rest on a right privilege to teach. I suppose that might have been regarded as such then, but not under current law. Okay. Well, another answer in sincere. The government made the same argument, and this Court said, well, sure, Congress has the plenary power to change the rules any time it wants. Just do it expressly. The question is not whether Congress can, but whether it has in fact changed the rules expressly to make that express tradeoff that the potential unfairness of retroactivity is worth it. Now, the final point here, I believe there was some reference earlier to reliance and the offense. And as the government concedes, reliance is not a prerequisite. This Court can rule for Petitioner and not even bother with reliance, but the presence of reliance here is an extra factor that supports, that shows the retroactivity to be obvious and severe. So the court of appeals' whole premise that reliance is necessary goes away. The government concedes the court of appeals implicitly was wrong on that. As a practical matter, our point is that defendants rely on the known consequences of offenses when they decide to plead guilty, as this Court recognized in the Petitioner. Roberts. Roberts. The operative issue here is when they commit the crime. We don't claim that there is a reliance interest in committing the crime, but in the decision to plead guilty as a practical matter, the defendants weigh a number of consequences, and one of those is whether they might have a 4-month discount off their sentencing guidelines, which was the inducement here. And another one is will they ever be able to see their parents again. So this, so this. Kennedy. Your position is that only those who have entered a guilty plea are entitled to the presumption against nonretroactivity, but not those who have been found guilty? Your Honor, our primary position is that because reliance isn't necessary, all of them benefit from it because they all have settled expectations. How do you explain sincere if reliance isn't necessary? Sincere is all about reliance. Yes. And at the end of this Court's opinion, the Court said that the presence of this reliance made the retroactive effect especially obvious and sincere, especially obvious and severe in sincere. That did not purport to overrule holdings in Landgraf and Hughes Aircraft where there had been no legally cognizable reliance. So sincere is an easy case because of the guilty plea, because of the reliance. But Landgraf and Hughes Aircraft didn't involve any reliance, and there was still retroactivity because the settled expectations were disrupted, because there were new consequences attached to pre-enactment conduct. So regardless of whether there is reliance, there are settled expectations that are upset by a law whose function or point is to punish and deter misconduct based on past wrongs. My client is trying to figure out what Congress intended, right? We're not talking about constitutionality. We're talking about a rule that it's presumed that statutes are only prospective, all right? And your argument is the reasonable expectation of Congress when they passed this was that it would only apply to people who, what, committed the crime or were convicted after the statute passed? Yes. Just as a matter of statutory interpretation. Yes, Your Honor. This — that is the background default rule against which Congress legislates. And in laws such as IRIRA and SORNA and elsewhere, Congress spells out when it wants to apply to pre-enactment offenses, to pre-enactment conduct. That's a defeasible civil retroactivity rule that can reach more broadly than the ex post facto jurisdiction. But do you have any case in which a court has deemed a statute retroactive even though it wasn't triggered until the party took some further action? Is there any case out there, either from this Court or from another Court, where we've said, you know, it's retroactive even though it depends upon a future event? Yes, Your Honor. Sincere depended on applying for discretionary relief in the future. He didn't have to. Cummings depended on trying to teach or preach or hold office. Ex parte Garland depended on trying to practice law in the future. Those are all disabilities, taking away a future ability based on a past wrong. That's what the disability category has to mean if it's to remain meaningful. And the government's approach would gut Justice Story's fourth category. If there are no further questions, I'd like to reserve the balance of my time. Roberts. Thank you, counsel. Mr. Miller. Mr. Chief Justice, and may it please the Court. As the discussion so far this morning reveals, the Court's retroactivity analysis takes account of a number of different factors. But the one that is most significant, and indeed in this case virtually dispositive, is that the application of section 1101A.13 to Petitioner was triggered only because he engaged in voluntary conduct that postdated the enactment of the statute. What do you take the trigger to be? Because in your brief you kept on talking about the trigger being the trip. And I would have thought that you would have talked more about the activity being the attempt to enter the country. Miller, that's – I mean, they're closely connected together in time, and they both – but they both postdate the enactment of the statute. But what the thing that is being regulated by section 1101A.13 is the entry of aliens into the United States. The statute sets out a comprehensive scheme for determining when an alien arriving at the border seeking to come into the United States should be regarded as seeking an admission. So that's conduct that takes place in the future. Part A of 1101A.13 sets out the general definition of admission, and then C sets out a number of exceptions. And so taken together, they're part of a comprehensive effort to codify Flutie in some respects. In particular, from Romanet 2, the 180-day provision is actually a fairly generous codification of Flutie, probably extending beyond what would have been regarded as a brief trip. Roberts. I have to say, I just don't understand this statute. This is somebody we would not allow into the country. And yet the only thing we say is you can't leave. I just don't understand how that works. I think there are two points to be made about that. And the first is that that is a feature of the statute writ large. I mean, that exists even with respect to post-enactment criminal convictions. So it's the second, I think, to understand it, it's helpful to look at the history. The distinction between grounds of inadmissibility and grounds of deportability goes back all the way to the 1917 Act. In that statute, a single crime of moral turpitude was a basis for inadmissibility, but was generally not a basis for deportability unless it had a one-year sentence and was committed within five years. Roberts. And I understand that there is a limitation on actually deporting the person. But here I would think the one thing you want the person to do is leave, maybe for a particular event, but maybe he'll decide to stay in Greece once he's there for the But it seems very odd to say we're going to show you how much we don't want you here. We're not going to let you leave. I think what this history shows is that it's the crossing the border that has always been regarded as a legally significant event. This Court's case is recognizing. But it wasn't before. I think we have held that an immigration lawyer is obliged to tell a defendant based on the criminal charge what the legal consequences, what the immigration consequences will be. And here, suppose before the, at the time of the plea in this case, the attorney had said, once you've served your time, you will be able to take brief casual trips. That would have been accurate advice, right, before IIRIRA? Well, I think the most important point about the consequence of the plea is that as an immediate result of the plea under pre-IRIRA law, so at the time he pleaded guilty in 1994, he made himself inadmissible. So that's not anything that has changed. So he knew that he was going to be inadmissible. Ginsburg. But I'm asking you, the lawyer talking to the client, and the client wants to know before I enter this plea, what will be the consequence for me? And the question that's asked is, will I still be able to visit my mother in Greece? What should the lawyer, what should the lawyer at that time have answered? I think the lawyer should have said, by pleading guilty, you are making yourself inadmissible to the United States. Under the current law, you will not be regarded as seeking an admission if you take a brief casual and innocent trip, but the change in the law. Right. Well, that's what's going to be important to the person, right, it's not inadmissible on all the legal terms.    on all the legal terms. But the court has made clear in Landgraf and in a number of other cases that, even  to take short trips to visit my mother. Yes, you are going to be able to make short trips to visit your mother, and then you wake up the next morning and Congress has passed a statute, and now you're not able to take short trips to visit your mother. So something very real has happened to the life of this person. Well, that's right. I mean, and there's no question but that there is a serious consequence as a result of the change in the law. But the court has made clear in Landgraf and in a number of other cases that even uncontroversially prospective statutes can impose a burden. That's true, but in St. Cyr, as I read it, on pages 322 and 23, the court focused directly not on the crime point of time, but the time of the guilty plea. And what the court says there is that a person who is thinking of pleading guilty might well have taken into account the fact that he could ask the Attorney General later, when he's about to be deported, to exercise discretion in his favor. So that's as I read those pages. You can say why I'm not reading them correctly, but that's how I read them. And then, having read it that way, I thought the question in this case is whether the person who's sitting at the table and deciding whether to plead guilty or not is likely to think, well, if I plead guilty, I can always ask for discretion. That's St. Cyr. Well, if I plead guilty, I can still visit my aging parents and grandparents, a matter that could be of importance to some people, as opposed to whether I will never see them again. Now, that seems to be the question. Is the second as likely to be in the person's mind as the first? And to tell you the truth, I don't know the answer. I mean, maybe it would be. There isn't that much chance of getting discretion. It might be important to some people to visit their aging parents and grandparents. So go ahead. Answer the question. Is the one more important than the other? And if not, why not? I think you've correctly described the reasoning of the Court in St. Cyr, and I think that that reasoning highlights two ways in which this case is significantly different. And the first is that in St. Cyr it was the guilty plea, the conviction, that was legally significant under the provision of IRIRA at issue there. And the Court emphasized that a guilty plea is a quid pro quo. It has to be knowing and voluntary. The Court cited Santabella v. New York, a due process case about guilty pleas. And so one difference in this case is that the legally significant event here is not the guilty plea. Breyer. But I'm really asking you, isn't my question the key question? Now, you can answer that no. But I mean, I suppose you could prove that the only thing that mattered to LPRs who plead guilty, the only thing that mattered was visiting their parents and grandparents. A matter, I doubt. But you can say even on that situation it would make no difference, or you could say I think the one's as important as the other, or you could say they're not. I just want to get your full answer, all your whole answer to my question. The conclusion to the first part of the answer is that it wouldn't make a difference because what matters here is not the guilty plea. What triggers the application of 1101a13c is the underlying criminal conduct. Kagan. You're quite right, Mr. Miller, as a formal matter, that that's true, that that's the words of the statute. But how many times has the Department of Homeland Security tried to declare a person inadmissible on the basis of the commission of a crime without putting into evidence either a conviction or a guilty plea? I don't have any. I can't imagine that it's like more than on one, you know, five fingers of your hand. I mean, that's the way people prove crimes in this area, isn't it? By convictions or guilty pleas. Well, I would say that, I mean, this is a statute. After trial or convictions by guilty pleas. The statute is being applied by, in the first instance, by customs officers at the airport or at the land border crossing. They have access to a number of databases which include not only records of convictions, but also things like arrest warrants. And an arrest warrant by itself would not be enough to show that a person had in fact committed an offense, but it might well trigger some further inquiry from the customs officer that would lead to them finding out more information or perhaps getting an admission from the first instance. If, as a fact of the matter, the way the commission of crime is proved in this area is through showing a conviction, does your distinction stand up at all? I mean, I think there is still, I think, a significant formal distinction. And then there is also another important distinction from St. Cyr, which is that that was a case where, as a result of the guilty plea plus the change in law, the person there faced immediate deportability with no prospect of discretionary relief. And the Court said that there is a clear difference for purposes of the retroactivity analysis between a possibility of deportability and a certainty of deportation. Here, not only is he not deportable, but there is no immediate consequence for him at all. The statute only has any effect on him when he engages in the post-enactment  And I think that's the difference. Ginsburg. What about the characterization which seemed to me to make common sense? Yes, the trigger is that he has gone abroad and is returning. But the target, they say, was the crime. That's why the law, the law really doesn't care about the travel back and forth. What it cares about is that this person was convicted of a crime. I don't think that's correct, Your Honor. And I think that highlights one of the distinctions between this case and Cummings v. Missouri and Ex parte Garland. In those cases, you had statutes that were nominally prospective in application, but the Court actually said that we think that what's really happening here is the statutes are imposing punishment for the completed acts. And to the extent there was any doubt in those cases themselves, this Court discussed them both in Harris-Iottes v. Shaughnessy and said that it viewed them as cases about punishment. This is not as much as you're saying. Sotomayor, isn't that the case here? Meaning it goes back to the Chief Justice's question, which is what they are trying to do is punish those individuals, those LPRs, who have committed this kind of crime by not letting them travel or come back in? That's really what their argument is, is, you know, you are imposing a punishment, a disability, for having committed the crime. You're not imposing a disability merely for the act of traveling. I mean, I think when you look at the statute as a whole, you see that it's a comprehensive regulation of crossing the border, which has always been regarded as a legally significant event. There are six subparts to 1101a, 13c. Five of them have nothing to do with past conduct. They are about the nature of the trip and what the alien is doing as he's coming in. And then you have this one, which is of a piece with the long history of drawing a distinction between inadmissibility and deportability. And I think it recognizes that. Roberts What is the policy underlying the rule that doesn't allow somebody who has a lawful status here to go to his grandmother's funeral and come back? It's going to take four days. He goes, he comes back. What policy supports prohibiting that travel? I mean, I think it reflects a judgment, you know, on the part of Congress over many, many years that it is one thing to say to an alien, all right, we're not going to go and try and find you and take you and kick you out of the country. It is quite another to say, you may freely cross our borders, even after having left, you may come back and we're without any inquiry. Roberts Okay, there are two different things, but I don't know that you've articulated what the policy is to prevent, prohibit somebody from doing that. I mean, other than referring you to the history and to the idea that's been reflected, this Court has recognized that control over the border is a core sovereign prerogative that lies at the heart of Congress's immigration power. And I think Congress is a part of it. Scalia Well, I suppose you could say that there's a likelihood of quite inequitable enforcement if, indeed, you adopt a position, we're going to pick up all of these people and send them away. That's not going to happen. It will be hit and miss. And on the other hand, you can enforce it rigorously and equitably upon everyone if you only forbid reentry to those people who want to come back in. They don't have to, you know, give their names to immigration and you can check on this statute. That seems to me a sensible reason. Roberts That's right. Breyer Why do you do that? Look, as I read the statute, it isn't even clear whether it overrules Rosenberg v. Flutie. I mean, they talk about admission, but admission, after all, could have an exception for the 4-day trip. That's what the Court said effectively in Rosenberg v. Flutie. So Congress certainly wasn't clear on what policy they're following. I would have thought that. You can disagree with that, but I think it's the part that's still gnawing at me, 95 percent of the people plead guilty. You know, everybody pleads guilty, all about, about. And now the consequence that this ex post enacts is he can't take the 4-day trip. And you keep saying, well, a 4-day trip requires action on a person's part. Right. Of course it does. So why does that matter? I mean, the fact is he can't take the 4-day trip. A 4-day trip requires action. You have to buy a trip ticket. You have to get on a plane. So? Well, I think if I could just first address the question of whether the statute in fact abrogates Flutie, and just to be clear on that, the question presented assumes that it does. Petitioner isn't challenging that. And the board in the Collado-Munoz decision has explained why the statute in fact does have that effect. And I think that the significance of this post enactment conduct, the significance of the trip, is illustrated by this Court's decision in Fernandez-Vargas, which made clear that when you have — when the application of the statute is within the control of the person to whom it's being applied, because he has to do something after it comes into effect, there it was choosing to remain in the United States and becoming subject to the reinstatement of a prior order of removal. Here it's taking the travel. But that goes a long way towards establishing that it doesn't have a retroactive effect, that it's regulating future conduct. Another one. Sotomayor In Fernandez's case, the illegal act was remaining, and so that was within your control. But the — you can't undo an illegal act that you've done to be able to trap. The act is now part of your background. And so there's nothing in your control to change that act once the statute has passed. And so you're carrying that around as a disability. In Fernandez-Vargas, the conduct that subjected the alien to the application of this procedural, this disadvantageous removal procedure was remaining in the United States. And it's true that that conduct was unlawful. But for purposes of the retroactivity analysis, the Court didn't focus on whether it was lawful or unlawful. What matters is that it was conduct that was in the future, that was after the statute was enacted. And so here, although the trip is not unlawful in that sense, it is future conduct. And here, as in Fernandez-Vargas, there is ample warning, which was another point that the Court emphasized in that case, ample warning that the statute would be applied to people who engaged in that conduct. I do want to address your — Kagan It can't be right that it's any future conduct if there's a trigger mechanism that is entirely random. You know, it's a — you can be deported if you've committed a crime of moral turpitude in the past, but not until you go to the movies on a Saturday. Surely that would not change the analysis. I think that's right, Your Honor, and I think the reason it wouldn't is reflected in some of this Court's — in the ex post facto analysis. If you have a statute that, for example, makes it a crime to have engaged in certain conduct in the past and then there's something — some commonplace, utterly trivial activity in the future, I think a court looking at that would say this is not a — although it is nominally prospective, this is really a statute aimed at punishing the prior conduct. Scalia Well, I don't know. I think it would be prospective and unconstitutional, because it's irrational. I mean, not everything that's unconstitutional is unconstitutional. Not everything that is unconstitutional is not prospective, it seems to me. Or do you think that's so? If it's unconstitutional in violation of the ex post facto law, the statute has to be — has to be prospective. I'm sorry. Has to be assumed not to cover that prior conduct. Is that right? I mean, I think the hypothetical statute I was describing, I think, would violate the ex post facto clause under the sort of analysis that this Court used in Smith v. Doe in upholding. Scalia Okay. And if it does, it automatically has to be interpreted not to cover that? My reason of the presumption of a crime. Oh, if you mean a parallel statute in the civil context, I think that's the best reading of Landgraf. And I think under the analysis suggested in your concurring opinion in Landgraf, I think one would look at that statute and say this is really a statute that's aimed at regulating the past conduct, and that has a retroactive effect. So, I mean, to finish that thought, I think I would just say that there is a narrow category of cases where you have what is in form a prospective regulation that's really aimed at — aimed at burdening or punishing a past act. But this is not that. And how do we separate those two? How do we decide that this is not that, and that it's instead something else, that it's a regulation of future conduct? In the criminal context, the Court has used the analysis of Kennedy v. Mendoza-Martinez to figure out whether a statute is imposing additional punishment for past conduct. And that looks at a number of factors. And the most important factor under that test, the Court has said, is whether the statute appears to be related to a legitimate prospective regulatory purpose. And so that's why, for example, statutes like 922G, the Felon in Possession statute, which was, I would point out, amended just back in 1996 to add misdemeanor crimes of domestic violence, which had not previously been something that would subject one to a firearms disability. That was added. Every court of appeals that has considered the question has held that it doesn't violate the Ex Post Facto Clause, and I think implicitly has held that it does, in fact, reach that conduct. Scalia. Even if you had pleaded guilty to spousal abuse? I'm not aware of any cases specifically addressing that question, but, yes, because there you have a statute that is regulating future conduct. It only applies to somebody who engages in the future conduct. The sex offender registration laws are another example that this Court has upheld. That kind of law obviously imposes a very significant burden on people on the basis of prior conduct, but the fact that there is some burden by itself does not mean that the statute is retroactive, nor does it mean that it's appropriately viewed as imposing a disability. I mean, I think that the Court in Landgraf quoted Justice Story's formulation of a disability as referring to statutes that impose a disability in respect to transactions that are already passed. So it is not enough that there used to be something that you could do, and now in the future you're not going to be able to do that. That's not a disability in the relevant sense. And if it were, I think the Court would have a very difficult line-drawing problem to figure out why it is that statutes like 922G are okay, or sex offender registration laws, or any number of. Breyer, that's why I think the Chief Justice's question and the ambiguity of the statute are relevant. Like with SORNA, you would apply it backwards, because that's a pretty clear intent. I don't know about, you know, like three times and you're out statutes, et cetera. But here you have the disability on the one side, the disadvantage to the person pleading guilty, that problem on the one hand. And on the other hand, you have the policy that, with a stat fill in the blank, with a statute that doesn't talk about it, but simply uses a new definition of admission or admissibility. That's do you want to say something about that? I think if you're if you're if you're asking whether Congress has specifically addressed the temporal scope of the statute, we acknowledge under St. Cyr that it hasn't. And so that's why we're at step two of the. More than that, I'm saying what's the policy on the other side, the policy that favors the retroactivity despite the fact that the person might not have pleaded guilty? And that's why I was interested in the Chief Justice's question and also the ambiguity of the language in the statute that they used. I think the policy is Congress was trying to redefine, I mean, they're replacing the old term of entry and replacing it with a new concept of admission. They're trying to redefine a comprehensive scheme for regulating the treatment of aliens arriving at the border. And I think you have to look at all the parts of it together as a scheme that was to be applied going forward when people arrived at the border in the future after the enactment of the statute. Are there no further questions? Could you go over again for me your distinction of St. Cyr? I think it's twofold, Your Honor. The first is that in St. Cyr, the legally significant event was the conviction, it was the guilty plea. Here, the guilty plea is significant because it makes Petitioner inadmissible, but that was true under current law. You don't argue that the significance of what the individual is giving up makes a difference? That's our second point, is that St. Cyr said there's a big difference between immediate deportability and the potential. Is there a difference in terms of what they face if they don't plead guilty? I've always had difficulty with St. Cyr and the notion that, say, someone pleads is facing, you know, 10 years and they plead guilty to 2 years, that the reason they did that is to, you know, avoid one of these immigration provisions. It seems to me it is to avoid 8 years. And I just wonder if the relative significance of what is at issue under the immigration law is something that we can take into account or if St. Cyr prohibits that. No, I think it is certainly appropriate to take into account that however significant the application of Flutie might be to aliens, it's on a different order of significance. Kagan. Kagan. But, Mr. Miller, the Solicitor General actually represented to us in the Judelang argument used that as an example, the Flutie case, as something that people doing pleas did think about and did rely upon. I think we don't question that that's something that people might have been aware of and have been thinking about, but it's not something that was bargained for in the plea agreement because it's not something that's affected by the plea agreement. The statute here is triggered by the post-enactment conduct of entering the country, but also by the pre-enactment conduct of committing the crime. And as Petitioner has acknowledged, there isn't any reliance in the state of immigration law when you choose to commit the crime. So I think that's a difference from the scenario that was addressed in Judelang. Thank you, Mr. Miller. Mr. Beavis, you have 6 minutes remaining. Thank you, Your Honor. I'd like to make five points. The first one is, this statute is poorly tailored to any protective or forward-looking effect. As the Court has noted, it's perverse effected to discourage people from leaving the country to keep them in. So any idea that the purpose is to get them out just doesn't square with the way the statute is written. As Justice Ginsburg noted, while the post-IRIRA innocent travel may be the trigger here, the obvious target is the pre-IRIRA offense. The statute is tied to misconduct. The natural inference of making misconduct not just a piece of evidence but a prerequisite is that it is the misconduct that is being penalized. Second, the impact, we suggest, is the relevant test. The impact is a penalty. It is a disability based on a past act that Mr. Vartelas is now helpless to undo. That is all that is required under Landgraf. If Congress thinks it important, it can expressly require retroactivity, but it hasn't done so. Third, let me make clear that we have alternative theories here. Reliance is something that makes the case worse. It is something that exacerbates the problem, makes it obvious and severe. And our amici, the NACDL brief, points out very movingly how important these kinds of considerations are in immigrants' decisions to plead guilty. Here, for example, my client received a 4-month discount off his sentencing range. It's entirely plausible to believe that immigrants in his situation might value the ability to stay in the same country with their 4-year-old and 2-year-old child as much as 4 months in jail. But our broader theory is that the violation of settled expectations is sufficient. Whether or not there is a reliance, the settled expectation that one has of planning one's life in this country and yet having relatives abroad one will tend to or care for their business, et cetera, that is sufficient. Just as in Landgraf and Hughes Aircraft, there were no legally cognizable reliance interests in discriminating or in submitting false claims, but changing the penalties is enough. Fourth, this Court's decision in Sincere, I believe, strongly helps our case. The first reason is that it imposed a disability, a disability on filing in the future for discretionary relief, but as a practical matter it's burdening past conduct. Secondly, Sincere didn't purport to change the holdings in Landgraf and Hughes Aircraft that those are other ways of showing impermissible retroactivity. The logic in Sincere is ineluctable, that because you are burdening a decision a decision that, as the Court in the amici in Sincere noted, matters greatly and factors into things like the plea bargaining calculus, that the retroactivity is especially obvious and severe. And let me note that Sincere was decided under this same statute, a privilege, not a right, a privilege that Congress can abrogate at any time. That did not influence this Court's holding at all. The right privilege distinction is dead in this area of law. If there is a privilege under IRIRA to apply for discretionary relief, there is a privilege to not be subject to the disability on one's traveling and returning. Finally, let me talk about the criminal civil line. I believe my brother here introduced Smith v. Doe and mentioned some of the sex offender cases. I've explained why the criminal cases in Ex Post Facto are different, but let me go into some more detail. The Court is well familiar with Smith v. Doe. That was a civil case that Doe attempted to turn into a criminal case under the very demanding standard in Kennedy v. Mendoza-Martinez. But that's a very uphill fight, as the Court's opinion recognized the Court must be very deferential before turning something facially civil into criminal, because then it's categorically forbidden and it comes with the criminal procedure protections in the Bill of Rights. That's not what we're doing now. We're not trying to say this law is forbidden. Smith v. Doe involved a law where the Court's opinion said on its face, the legislature made it retroactive. It says it's retroactive. The Federal law SORNA is expressly retroactive in Section 113d. IRIRA is expressly retroactive. That's a different inquiry where you're asking does the Ex Post Facto clause forbid something that's expressly retroactive? Does Mendoza-Martinez turn it into a criminal case? Versus here, where it's not retroactive, all Congress has to do is spell it out. If this Court adheres to its previous jurisprudence, the guidance to the drafters across the street is clear. Just draft the statutes the way you've always been doing it, say before, on, or after effective date. Alito, do you think we have the authority to tell Congress how to draft its laws? I thought what we were doing was trying to infer what they intended. Yes, Your Honor. We send them a drafting manual? Now, you can do this, but you can only do it if you do it, if you follow the steps that we've prescribed. I mean, you've said this over and over. It seems to be completely unfounded. Your Honor, this Court has said that it's important to adhere to its traditional tools of statutory construction because it's a settled background rule against which Congress legislates, which it is aware of. I think Landgraf is clear and settled. And you're over there in Congress and you say, boy, I know how this statute is going to come out under Landgraf. Yes, Your Honor. Better than I am. Let me explain. This Court decided Landgraf two decades ago. A few years after Landgraf, Congress passed IRIRA in 1996. IRIRA contains express retroactivity provisions that go hand in glove with the Landgraf presumption. And then Congress passed SORNA, to which my brother alludes. SORNA in 2005, likewise, in Section 113d, says, yes, this sex offender registration shall apply, the Attorney General can apply it to people with pre-SORNA convictions. Congress understands the Landgraf presumption. In those statutes and others, it has legislated against it. It can continue to do it because this Court should continue to use its traditional tools of statutory construction. Scalia Well, that can be explained because Congress understands that who knows whether it's going to be held to be retroactive or not. If you surely want it to apply, you better say so. If that's the rule you want us to adopt, that's okay. Waxman Yes, Your Honor. And a clear statement rule has that virtue, as I believe Your Honor is well aware. For all these reasons, we ask this Court to reverse the judgment below and remand. Roberts Thank you, counsel. Counsel. The case is submitted.